PHILIP W. McABEE, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 3772–3774, 3731, 3145.  Promulgated November 28, 1945.

---

[1] Mintie Carroll H. McAbee (3772) and A. Clifford Shinkle, Jr., and Philip W. McAbee, Surviving Trustees of the Estate of Daniel C. Hemingray, Dec'd. (3773), were consolidated with Philip W. McAbee (3774) for trial.  In Minot K. Holmes (3731) it was stipulated that decision should be governed by decision in Docket No. 3773.  In Willard P. Zimmerman (3145) a separate trial was had.  It was stipulated that the testimony of Philip W. McAbee, Minot K. Holmes, Carl Smith, and Willard P. Zimmerman in the consolidated cases should be considered in the last mentioned case.

*William H. Thompson, Esq., Perry E. O'Neal, Esq., Patrick J. Smith, Esq., M. A. Roney, Esq.,* and *M. G. Leatherman, Esq.,* and *Troy G. Thurston, C. P. A.,* and *George S. Olive, C. P. A.,* for the petitioners.

*Lester M. Ponder, Esq.,* for the respondent.

1134

MELLOTT, *Judge*: A partial summary of the facts will bring the issues into focus. McAbee, in 1933, acquired, in the manner shown in our findings, legal title to all of the shares of a corporation of which he was president (Hemingray), except those owned by its secretary-treasurer (Zimmerman), to the end that they and McAbee's wife might take the necessary steps to merge it with a larger company (Owens). The plan of reorganization—which, according to the letter of McAbee to the stockholders of Hemingray dated April 8, 1933, had then proceeded to such a point that it was essential prompt action be taken—contemplated that 17,827 shares of Owens stock, plus some cash, should be given by Owens for Hemingray's assets, with the correlative obligation of Hemingray to pay all of its own debts. Fulfillment of the last mentioned obligation—assured through the deposit of 10,000 of the Owens shares in escrow, but actually brought about through the sale of Owens stock transferred to Hemingray and not placed in escrow—resulted in the ultimate receipt by McAbee and Zimmerman of cash in the amount of approximately $45,000 and a substantial block of Owens stock. The aggregate of the cash and fair market value of the stock received by McAbee in 1935 was $46,900 and in 1937, $303,500. The aggregate of the cash and fair market value of the stock received by Zimmerman in 1935 was $11,725 and in 1937, $75,875. These amounts were included by respondent in their respective gross incomes and the correctness of this action constitutes the first issue.

The stockholders of Hemingray as of the date immediately preceding the transfer of the legal title to their stock to McAbee expected to receive and ultimately did receive 4 shares of Owens stock for each share of Hemingray stock owned on April 1, 1933. Stock of Owens on the basis of 1 share for 1 of Hemingray was received by each in 1933, 2 for 1 in 1934, and 1 for 1 in 1937. The respondent has included in the gross income of each [except McAbee, who according to respondent's theory gained no tax advantage from the receipt of 81 shares of Owens in 1937 because the amount of gain was more than offset by allowable capital losses] the fair market value of the Owens stock received in 1937 as a liquidating dividend "from, or for the account of" Owens. The second issue in the Zimmerman case and the sole issue in the cases of Mrs. McAbee, Holmes, and the trustees questions the propriety of this adjustment as well as the alternative adjustment shown in our findings.

The third issue in the Zimmerman case, no similar question being present in any of the others,[2] is whether the respondent erred in treat-

[2] It appears that Holmes received the same amount from Owens in 1937 in connection with the contracts shown in our findings; but no issue between him and the respondent is raised by the pleadings in his case.

ing the amount received by him in 1937 from Owens ($6,250), under the contracts with reference to the process for the treatment of glass containers, as ordinary income instead of gain from the sale of a capital asset, subject to the percentage limitations of section 117 of the Revenue Act of 1936. The three issues will be discussed in the order stated. Unless otherwise indicated all references in this opinion to petitioner or petitioners include only those who have raised the particular issue under discussion.

### ISSUE I.

Were the amounts aggregating $555,245 properly included by the respondent in the gross incomes of McAbee and Zimmerman for the years 1935 and 1937 either under section 22 (a) of the Revenue Acts of 1934 and 1936 as compensation for services or as liquidating dividends on stock having a zero basis in their hands? Petitioners insist that the facts support neither view. They contend that, at the time of the transfer by Hemingray of substantially all of its assets to Owens in exchange for Owens stock, they were the owners of all of the Hemingray stock; that the transaction constituted a reorganization under section 112 (i) (1) (A) of the Revenue Act of 1932; that the Owens stock was received in pursuance of the plan of reorganization; and that no gain is to be recognized to them under section 112 (g) of the applicable act. In the alternative, they contend that, if it be held gain was realized by them upon the receipt of Owens stock, then only 30 per centum thereof is to be taken into account in computing their net incomes because of the provisions of section 117 of the applicable revenue acts. They also contend that the portion of the cash received which represented dividends upon the Owens stock is taxable to them as dividends.

The parties all recognize that the ownership of the Hemingray stock on the date the transaction between Hemingray and Owens occurred is crucial. We therefore approach the question as the parties have approached it and first determine the ownership of the stock.

Petitioners contend that they owned all of the Hemingray shares in the proportions of 80 percentum by McAbee and 20 percentum by Zimmerman. They urge that "an actual sale" of the 2,298 shares had been made to them by the other shareholders. Upon brief Zimmerman characterizes the transaction evidenced by McAbee's letter to the stockholders as an offer by McAbee to purchase, on behalf of himself and Zimmerman, the 2,298 shares of Hemingray, provided the pending deal with Owens was consummated, and to pay the owners, in that event, 4 shares of Owens for each share of Hemingray sold. This offer, he contends, "became a binding contract on May 2, 1933, when the final authorization and approval of the Hemingray and Owens-Illinois

agreement of April 25, 1933, was granted or voted by the Hemingray shareholders." McAbee merely contends that the stockholders "sold their shares of stock * * * to * * * McAbee for the joint benefit of himself and Zimmerman on or about April 20, 1933." Both urge, however, that the question whether a sale was made is a question of the intent of the parties. They place substantial reliance upon oral evidence adduced at the trial tending to show that some of the stockholders considered they had sold their stock and upon the statements of McAbee and Zimmerman to the effect that they understood that they were the owners of it. Recognizing that McAbee's letter to the stockholders is the best evidence of the intent of the parties, they urge that, while the first four paragraphs may tend to support respondent's view that the relationship contemplated was one of agency, the remainder of the letter, when considered in conjunction with the other things which were done, shows clearly that a sale of the stock was made.

The letter from McAbee to the stockholders is shown in full in our findings and need not be set out at this juncture. Some of the circumstances relied upon by petitioners, in addition to the oral evidence, are the fact that the shares were delivered by unrestricted endorsement to McAbee and new certificates were issued, unqualified by any designation as agent; that Indiana intangible stamps were attached by McAbee; that Shinkle was replaced as a director on the ground that he was not a shareholder; that the shares were not retransferred to the stockholders; that the former stockholders of Hemingray never thereafter participated in shareholder meetings; that the certificates of beneficial interest referred to the transaction as a sale and were assignable; and that both petitioners treated the transaction as a purchase in their income tax returns. These circumstances have not been ignored by us; but in our judgment they are not sufficient to vary or change the written agreement. Nor is the agreement so unintelligible or ambiguous as to require evidence *aliunde* to explain its meaning.

A brief résumé of the undisputed facts may not be inappropriate. Negotiations looking to the disposition of Hemingray or merging it with a larger corporation had been going on for approximately three years prior to April 1933. These negotiations had been conducted by McAbee as president of Hemingray and were known to Hemingray's stockholders. It was understood between McAbee and Zimmerman that McAbee was acting in behalf of both of them and that any profit made would be divided between them in the ratio of 80 percent for McAbee and 20 percent for Zimmerman. Sometime prior to April 1933 a plan was formulated under which Owens would acquire the assets of Hemingray in exchange for 17,827 shares of the Owens common stock and certain cash to be used in paying Hemingray's obligations. The remaining Hemingray obligations were to be paid from funds realized from the sale of a part of the Owens stock.

In the letter of April 8, 1933, McAbee informed the stockholders of Hemingray that the negotiations were "rapidly approaching consummation," and the plan to distribute to them four shares of Owens stock for each share of the Hemingray then owned by them was outlined. McAbee informed them that he expected to make "a substantial personal profit as compensation" for his services in negotiating the sale and the surrender of his contract with Hemingray, which had a term of years yet to run. He proposed that the Hemingray shareholders sign their certificates in blank and turn them over to him, thus clothing him with authority to close the deal. This proposal was set out in the letter as follows:

In view of the complexity of the negotiations and of the purchaser's requirements of certain stockholder and director action and to facilitate the prompt completion of these negotiations, it is desirable that I be placed in a position to act with authority and finality.

To that end I ask that you send me immediately all of the certificates of stock of the Hemingray Glass Company standing in your name and endorsed in blank which I will cause to be transferred to myself. If, for any reason the deal is not completed, these stock certificates will be reissued in your name and without expense to you and promptly returned to you. This is, of course, to be done with the understanding that a delivery of these certificates to me constitutes full authority to me to complete this transaction and take all steps necessary to do so.

Upon receipt of this letter the Hemingray stockholders endorsed their certificates in blank and turned them over to McAbee, who immediately caused an equal number of Hemingray shares to be issued to him. He thereafter held these shares as record owner and voted them in meetings of Hemingray's directors and stockholders.

On the same date that the Hemingray shares were issued to McAbee he entered into a written contract with Zimmerman, who had assisted in the negotiations, for a division between them of the "profits" which might accrue to him "in accordance with the agreement of the stockholders."

Obviously the proposal of McAbee and its acceptance by the stockholders constituted an agreement between them and must be considered as expressing their intention in the premises. Nowhere in this agreement or in the agreement between McAbee and Zimmerman do we find any suggestion of an intention on the part of the stockholders to sell their Hemingray stock to McAbee, or any intention on his part to purchase it. On the contrary, both agreements evidence an intention that McAbee was to act as the agent of the Hemingray stockholders in negotiating the transaction between Owens and Hemingray and to get a substantial profit for his services. In his proposal to the stockholders McAbee made it clear that the purpose of the transfer of their certificates to him was to enable him "to act with authority and finality." All references to a sale were carefully avoided and it was specifically provided that "if for any reason the deal is not completed, these stock

certificates will be reissued in your name without expense to you and promptly returned to you."

It is immaterial that McAbee, subsequent to the surrender of the stock to him in accordance with his letter of April 8, 1933, may have referred to the transaction, in self-serving documents prepared by him, as a sale. He could not, unilaterally, change his agreement with the stockholders. Nor is the fact that he became the record owner of the stock determinative of his rights. He was the moving spirit behind the reorganization, aided and abetted by Zimmerman. They hoped to be able to carry it out in such a fashion that they would secure, as they did, 5.3 shares of Owens stock for each share of Hemingray stock, after the payment of 2,200 shares to Flood as a commission and after the payment of Hemingray's obligations. Four of such shares were to be turned over to the stockholders "upon the consummation of the deal;" and as consideration to the officers for surrendering their contracts and disabling themselves from reengaging in the glass business for five years and "as compensation for negotiating" the sale of the Hemingray assets they were "to make a substantial personal profit out of the sale." The substantial personal profit consisted of 3,250 shares of Owens stock (over and above the number of shares received by them as stockholders), most of which was received during the two taxable years now before us.

In our judgment the respondent committed no error in including in the gross incomes of petitioners the portion of the "personal profit" represented by the shares received by them in the taxable years. His characterization of the stock as "commissions" or compensation for services accords with our view. Whether such compensation was received from Hemingray or from its stockholders need not be determined. The conclusion we have reached rests in part upon our interpretation of the contract between McAbee and the stockholders as merely one of agency. It is also supported by the contract of April 20, 1933, between McAbee and Zimmerman, in which they agreed (see paragraph 3) to divide "the net profits," the ownership thereof being "effective if and when such profits accrue." In any event it can not be found upon this record that a sale of Hemingray shares had been made to McAbee or to McAbee and Zimmerman in the year 1933. Cf. *Albert Russel Erskine*, 26 B. T. A. 147; *Roscoe H. Aldrich*, 3 B. T. A. 911.

Petitioners quote at length from *Helvering* v. *Tex Penn Oil Co.*, 300 U. S. 481, and argue that it supports the view that McAbee's agreement to return the stock if reorganization was not effected with Owens "does not establish that no sale was made to him." We accept the conclusion thus stated; but it furnishes no ground for overturning the Commissioner's determination. In the cited case there was no dispute that actual sales were made, subject to a condition that payment

be made later, failing which the shares would be returned. Our question, however, is whether any sale was ever made. We believe it should be answered in the negative and so hold.

From what has been said it is obvious we are of the opinion petitioners were not the owners of all of the stock of Hemingray when Owens acquired substantially all of its assets. It follows that both of petitioners' major contentions fail; for the Owens stock was not acquired by them pursuant to a plan of reorganization nor as an exchange of capital assets within the purview of section 117.

The treatment of the cash dividends received by petitioners upon the Owens stock should be consistent with the views heretofore expressed and with our decision under the second issue. So much of the cash received in 1935—none was received in 1937—as represented dividends upon the 81 and 121 shares owned by petitioners should, of course, be included in gross income as dividends. The additional amounts paid to petitioners on May 31, 1935—$8,800 to McAbee and $2,200 to Zimmerman—are not shown to have been dividends but merely, in the language of the stipulations, "cash distributions" or "amounts in cash," paid to them by Hemingray. No error in respondent's treatment of these amounts has theretofore been shown.

## Issue II.

The question presented under this issue is whether Zimmerman, Mrs. McAbee, Holmes, and the trustees of the estate of Daniel C. Hemingray, deceased, are required to include in their gross incomes for 1937 the fair market value of the Owens stock received by them in that year in the ratio of 1 share of Owens stock for 1 share of Hemingray stock owned by them and standing in their name prior to April 1933. Respondent has included the various amounts on the theory that they were liquidating dividends from, or on account of, Hemingray Glass Co.

No part of the value of the Owens stock in question, distributed to petitioners from escrow, was reported by them in their 1937 income tax returns. They contend that they sold their shares in Hemingray to McAbee on or about April 20, 1933; that the transaction was an exchange on which gain or loss was realized under the Revenue Act of 1932; and that the Owens stock delivered to them in 1937 was constructively received by them in a prior year and can not in any event be considered as liquidating dividends from Hemingray. In the alternative they contend that, if it is held that gain was realized from the receipt by them of Owens stock in 1937, then only 30 percent thereof is taxable under section 117 of the applicable revenue acts.

Respondent argues that petitioners realized taxable income in the year 1937 as a result of the receipt by them in that year, as liquidating

dividends from or for the account of Hemingray Glass Co., of shares of Owens stock, which, on account of distributions to them in prior years to the extent of the cost thereof, had a zero basis. He agrees that the acquisition by Owens of all the assets of Hemingray for a consideration consisting of 17,827 shares of its common stock and approximately $85,000 in cash constituted a reorganization within the definition contained in section 112 (i) (1) (A) of the Revenue Act of 1932; but, since the statutory definition of reorganization was changed with the Revenue Act of 1934, he contends that under the new definition, where control does not remain in the transferor but is in the stockholder, the consideration must consist solely of voting stock; that since the transaction was not a reorganization under the 1934 or 1936 Acts, the distributions to petitioners in 1937 must be considered distributions in liquidation; and that they are not tax-free distributions in connection with a reorganization. He insists, therefore, that petitioners received liquidating dividends in 1937 of Owens stock in proportion to their ownership of Hemingray stock (1 share of Owens for 1 share of Hemingray) and cash representing dividends on the Owens stock, and that the Owens stock received had a zero basis beginning with the year 1935.[3]

Briefly reviewing the facts and consistent with the view heretofore expressed under issue I—that the stockholders remained the equitable owners of the Hemingray shares after they were turned over to McAbee—there was distributed to each, in 1933, at the direction of McAbee, president of Hemingray, one share of Owens stock for each share of Hemingray stock and a "certificate of beneficial interest" for each shareholder's remaining shares of Owens, which had been deposited in escrow to guarantee performance by Hemingray of its agreement with Owens. Thereafter the holders of the "certificates of beneficial interest" received the dividends on the stock held in escrow. The "certificates of beneficial interest" were accepted by banks as security for loans and the holders were always considered to be entitled to the stock, subject only to the escrow agreement. All the benefits of the Owens stock allocated to them accrued to the Hemingray stockholders in 1933. Pursuant to the plan of reorganization, the stockholders of record of Hemingray in July 1933 authorized the distribution of all the assets of Hemingray not needed for the payment of its liabilities and ratified all the steps theretofore taken by

---

[3] In computing the basis of the 81 shares owned by McAbee prior to April 1933, the respondent reduced the original basis by the cash dividend of June 3, 1933, in the amount of $526.50 and the adjusted basis of the 81 shares of Owens stock distributed on that date in the amount of $2,769.63, leaving a basis for the 81 shares of $10,303.87. In 1934 McAbee received cash in the amount of $263.25 and 162 shares of Owens stock having a value of $78.75 per share, or a total of $12,757.50, an amount $2,716.88 in excess of the adjusted basis, thus giving the 81 shares a zero basis beginning with the year 1935. This same principle was applied to the "other" shareholders of Hemingray.

the officers and directors in carrying out and effecting the plan of reorganization.

In our opinion the Hemingray stockholders acquired equitable title to the Owens stock in 1933 when it was placed in escrow for their benefit. Thereafter the stock was held merely as security for the performance by Hemingray of its agreement to pay its obligations. *Bonham* v. *Commissioner*, 89 Fed. (2d) 725. The Owens stock was therefore distributed to the Hemingray stockholders in 1933 according to the plan of reorganization and no gain or loss was to be recognized because of the provisions of section 112 of the Revenue Act of 1932. The release of the stock from escrow in 1937 and the delivery of it to petitioners was not, in our opinion, a transaction in which gain or loss is to be recognized. Cf. *D. W. Douglas*, 37 B. T. A. 1122. See also *Schweitzer & Conrad, Inc.*, 41 B. T. A. 533. *Commissioner* v. *Levi*, 136 Fed. (2d) 366, and *Commissioner* v. *Kaufmann*, 137 Fed. (2d) 524, relied upon by respondent, are distinguishable on their facts. In both cases the stock there dealt with was not issued until the year following the resolution authorizing its distribution.

The question whether the dividends paid on the Owens stock held in escrow and turned over to petitioners during 1937 are taxable to them as dividends or as ordinary income is disposed of by what we have held regarding stock ownership. We hold that they are taxable as dividends. Cf. *Charles Chaplin*, 46 B. T. A. 385, affirmed on this issue *Chaplin* v. *Commissioner*, 136 Fed. (2d) 298.

## Issue III.

This issue raises the question whether the $6,250 received by Zimmerman in 1937 in connection with the contracts shown in our findings involving the patented process for the treatment of glass containers is income taxable 100 percent, or capital gain, taxable under section 117 of the Revenue Act of 1936.

Respondent has treated the amount received during the taxable year as ordinary income not subject to the percentage limitation contained in section 117. He contends that the amended contract of April 5, 1937, which was entered into with Owens, was either a commutation, on a lump sum basis, of future royalties to be received under the original contract with Hemingray dated February 20, 1933, or a commutation, on a lump sum basis, of the remaining selling price. His primary contention is based on his determination that the contract of February 20, 1933, was for the payment of royalties to petitioner and Holmes for the use of their invention.

Petitioner contends that only 60 percent of the amount received in 1937 is to be taken into account in computing his net income because it resulted from "the sale or exchange" of a capital asset, held for

more than two years but not for more than five years. (Sec. 117 (a), Revenue Act of 1936.) His argument proceeds as follows: The inventors, on February 20, 1933, entered into a contract for the sale of their invention and patent. The purchaser transferred its rights to Owens under the reorganization contract of April 25, 1933; but between that date and the date the agreement of April 5, 1937, was made, no discussions were had with Owens with reference to the payments. Therefore no novation of the contract had occurred notwithstanding the fact that Owens made the payments required by the contract of February 20, 1933. In this situation petitioner, by entering into the second contract on April 5, 1937, "received an asset—contractual rights against Owens—in consideration of which he gave up rights against Hemingray." The rights given up and the rights acquired were of a different character. Therefore there was an exchange of property. The property given up in the exchange—the right to receive the stipulated payment—had been held for more than two years but less than five years. Therefore the cited section is applicable.

The argument is ingenious but in our judgment unsound. Under the contract of February 20, 1933, petitioner and Holmes "sold, assigned and transferred" all of their right, title and interest in the invention and authorized and requested the Commissioner of Patents to issue any letters patent granted on the pending applications to Hemingray "as the assignee of their entire rights, titles and interests in and to the same, for the sole use and behoof" of Hemingray and its legal representatives, together with the full and exclusive right to any improvements "heretofore or hereafter made by them." The consideration to be paid therefor was to be computed on all articles manufactured under the patents, either by Hemingray or its licensees, at from 5 cents to 15 cents per gross, depending on the weight of the articles. Upon execution of the contract the title to the patent rights passed to Hemingray, with the power to assign them or to grant licenses under them. Clearly this was a sale and not a licensing agreement. See *Goldsmith* v. *Commissioner*, 143 Fed. (2d) 466, affirming 1 T. C. 711, and cf. *Sax Rohmer*, 5 T. C. 183.

The sale contract was binding upon Owens as the successor and assignee of Hemingray. Thus it was obligated to make the payments, regardless of any novation, and did so for more than four years. During the year 1937 the parties to the contract merely agreed, as we interpret the so-called amended contract, to commute the specified sale price through the payment by Owens of lump payments aggregating $50,000. The amount, however, was consideration for the property sold. Petitioner does not contend that the property—i. e., the exclusive right to the invention and any improvements thereon—had been held for more than two years but less than five years at the

time the sale was made in 1933. In our opinion, therefore, the Commissioner properly treated the amount presently in issue as part of the sale price of property other than a capital asset.

Reviewed by the Court.

*Decision will be entered under Rule 50.*